IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| DIANA S. SHELBY, | ) | |
| | ) | No. 31494-4-III |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WASHINGTON STATE | ) | UNPUBLISHED OPINION |
| DEPARTMENT OF HEALTH, | ) | |
| | ) | |
| Respondent. | ) | |

SIDDOWAY, C.J. — Diana Shelby, a licensed denturist, appeals the outcome of an administrative proceeding against her by the Washington State Department of Health, which was affirmed by the Benton County Superior Court. She assigns error to 16 findings of fact and 4 conclusions of law, and contends that the evidence was insufficient to support the tier of sanctions imposed by the health law judge. We find no error and affirm.

FACTS AND PROCEDURAL BACKGROUND

Diana Shelby became a licensed denturist under chapter 18.30 RCW in 1999.

In February 2008, one of Ms. Shelby's former patients filed the following complaint with the Washington State Department of Health:

During the 6 to 7 months that I had Ms. Shelby's "temporary"
denture I had first 1 tooth come out after 3½ months of wear. After about a

week after the 1st tooth came out a 2nd tooth came out. Ms. Shelby fixed both times. Because the 2 teeth came out so easily I went to another denturist. While at First Choice Dentures a crack in the denture was discovered. I then took the denture back to Ms. Shelby & she fixed it. While I was waiting until the first of the year so my Dad would have enough money to get my permanent denture[,] I had 3 more teeth come out of the denture & a large crack appeared. So I decided to get my new denture from 1st Choice Denture & I asked for my money back from Ms. Shelby. She refused.

I am sending you pictures of the infearior [sic] material & or job that she did. I'm also sending you the letter that she wrote me in return, instead of sending me a refund. She basicly [sic] accused me of being stupid & [Joseph] Vize of stealing clients. For most of the time that I had Ms. Shelby's denture I was unable to use it due to teeth coming out & or cracks recurring while eating.

Clerk's Papers (CP) at 174-75.

Following an investigation, the department filed a statement of charges of unprofessional conduct against Ms. Shelby, alleging that teeth had not been adequately bound to the patient's denture base, causing them to break off repeatedly, and that the porous nature of the denture's acrylic caused multiple fractures during the treatment period. Ms. Shelby requested a hearing to contest the charges.

Before the hearing, the department amended its statement of charges to identify the following five respects in which it alleged that Ms. Shelby's treatment of the patient fell below the standard of care of a Washington denturist:

[1] Respondent did not adequately bind the denture's teeth to the denture base, causing them to repeatedly break off;
[2] Respondent poorly constructed the denture, causing malocclusion;

2

[3]    Respondent did not adequately address the porous nature of the denture acrylic which:
[c]aused multiple fractures during the treatment period [and] [m]ade the denture susceptible to bacteria, subjecting the patient to the risk of illness;

[4]    Respondent left soft temporary liners in the patient's mouth for too long, which made them susceptible to bacteria, subjecting the patient to the risk of illness; [and]

[5]    Respondent failed to offer and/or provide services of a nature or in a manner that resolved the above problems or met the standard of care.

CP at 372.

A hearing was held over three days, at which the department called four witnesses: Ms. Shelby; the patient; Val Cherron, a denturist retained by the department as an expert; and Joseph Vize, the patient's treating denturist following her treatment by Ms. Shelby. Ms. Shelby testified on her own behalf, questioned the patient further, and called as her own expert witness, Dr. Michael Shannon, a dentist with training in denture construction.

Having heard the evidence and argument, the health law judge concluded that the department had proved that Ms. Shelby committed unprofessional conduct based on findings (among others) that the cause of teeth falling out of the denture was its improper construction due to an improper bond between the denture acrylic and the denture teeth; that the cause of fractures in the denture was also its improper construction, due to the porous nature of the denture acrylic; that "[i]t was a violation of the denturist standard of care to instruct [the patient] to continue to use a temporary denture when the denture was a poor fit, it fractured and lost teeth, and the pain and discomfort associated with the

3

denture could not be alleviated by the denturist or by the [patient] using over-the-counter

products"; and that

> [t]he problems with the denture as constructed could not be remedied by
> repairing the denture. [Ms. Shelby] should not have offered to reline the
> denture since the reline would not have corrected the problems with
> improper construction. Under the denturist standard of care, [Ms. Shelby]
> should have constructed a new denture for [the patient] at no cost to the
> patient. This should have occurred without regard to the life of the original
> temporary denture.

CP at 395. The health law judge imposed a two-year suspension of Ms. Shelby's

denturist license, a $5,000 fine, and required Ms. Shelby to refund all fees she had

charged the patient for treatment.

Ms. Shelby's motion for reconsideration was denied, after which she petitioned for

judicial review. After the Benton County Superior Court upheld the department's final

order, Ms. Shelby filed this appeal.

## ANALYSIS

### I. *Standard of Review*

Well settled law governs our review of the decision of an administrative agency.

We review the decision from the same standpoint as the trial court, and apply the

exclusive bases for relief from agency orders in adjudicative proceedings set forth in the

Administrative Procedure Act (APA), chapter 34.05 RCW, directly to the record before

the agency. *Lewis County v. W. Wash. Growth Mgmt. Hearings Bd.*, 157 Wn.2d 488,

497, 139 P.3d 1096 (2006). We will grant relief from the health law judge's order only if

4

we find one of the defects identified in RCW 34.05.570(3) as warranting relief. *Lewis County*, 157 Wn.2d at 498. The party asserting the invalidity of agency action has the burden of demonstrating error. RCW 34.05.570(1)(a).

Ms. Shelby challenges the health law judge's order as unsupported by substantial evidence as required by RCW 34.05.570(3)(e), which provides for relief where "[t]he order is not supported by evidence that is substantial when viewed in light of the whole record before the court." Where an agency decision is challenged on that basis, we must determine "whether there is 'a sufficient quantity of evidence to persuade a fair-minded person of the truth or correctness of the order.'" *Kittitas County v. E. Wash. Growth Mgmt. Hearings Bd.*, 172 Wn.2d 144, 155, 256 P.3d 1193 (2011) (internal quotation marks omitted) (quoting *Thurston County v. W. Wash. Growth Mgmt. Hearings Bd.*, 164 Wn.2d 329, 341, 190 P.3d 38 (2008)).

The substantial evidence standard is highly deferential to the agency fact finder, and requires us to view the evidence in the light most favorable to the prevailing party in the highest administrative fact finding forum below. *Arco Prods. Co. v. Utils. & Transp. Comm'n*, 125 Wn.2d 805, 812, 888 P.2d 728 (1995). Deference is given to the trier of fact regarding witness credibility or conflicting testimony and we do not weigh the evidence or substitute our judgment. *Phoenix Dev., Inc. v. City of Woodinville*, 171 Wn.2d 820, 831-32, 256 P.2d 1150 (2011). We need not be persuaded of the truth or correctness of an agency's findings, only that any fair-minded person could have ruled as

No. 31494-4-III
*Shelby v. Wash. State Dep't of Health*

the agency did in light of the evidence. *Callecod v. Wash. State Patrol*, 84 Wn. App. 663, 676 n.9, 929 P.2d 510 (1997).

The health law judge treated the department's proceeding as implicating a significant property interest on Ms. Shelby's part in her denturist license, and for that reason held the department to a burden of proving its charges by clear, cogent, and convincing evidence. *Bang D. Nguyen v. Dep't of Health, Med. Quality Assurance Comm'n*, 144 Wn.2d 516, 29 P.3d 689 (2001). The department did not object to the heightened standard.[1] When finding unprofessional conduct, an administrative agency may use its experience and specialized knowledge to evaluate and draw inferences from the evidence. RCW 34.05.452(5); *In re Disciplinary Proceeding Against Brown*, 94 Wn. App. 7, 13-14, 972 P.2d 101 (1998).

Ms. Shelby argues that the clear and convincing standard applied by the health law judge implicates a corresponding duty on our part to make an "independent determination

---

[1] For the first time on appeal, the department argues that *Hardee v. Department of Social & Health Services*, 172 Wn.2d 1, 9, 256 P.3d 339 (2011) has since made clear that the clear and convincing standard applies to only those license revocation proceedings in which the value of the property interest at stake requires a heightened standard of proof as a matter of due process, that not all occupations require an identical personal investment, and that not all state-granted credentials constitute a professional license. The department now submits that Ms. Shelby's investment of "'time, expense, and education'" in her denturist license is insufficient to require the heightened burden of proof and that we may apply a preponderance of evidence standard in reviewing the record. Br. of Resp't at 8 (quoting *Hardee*, 172 Wn.2d at 16). We will not entertain a challenge for the first time on appeal to an assertedly too-high burden of proof applied without objection below. RAP 2.5(a).

of whether the trial judge was correct in determining that the evidence was sufficient to be clear and convincing," relying on *In re Estate of Reilly*, 78 Wn.2d 623, 479 P.2d 1 (1970), a case involving a will contest. Br. of Appellant at 29. Washington courts have declined to accept the invitation to "fashion a new and higher standard of review for appeals in medical disciplinary proceedings." *Ancier v. Dep't of Health, Med. Quality Assurance Comm'n*, 140 Wn. App. 564, 572-73 n.12, 166 P.3d 829 (2007). The standard of appellate review has been established by the legislature. "Appellate courts do not reweigh the evidence but are limited to assessing whether that evidence was adequate to satisfy the applicable burden of proof below"—in this case, clear and convincing evidence. *Id.*

Ms. Shelby assigns error to a number of findings of fact and conclusions of law, and contends that the evidence was insufficient to support the tier of sanctions imposed by the health law judge. We first address her challenges to specific findings and conclusions and then turn to her challenge to the sanctions.

## II. *Challenged Findings and Conclusions*

The health law judge organized his findings of fact into sections; Ms. Shelby assigns error to findings included in his introduction, in the "denturist standard of care" section, and in the section addressing Ms. Shelby's treatment of the complaining patient. We address the challenged findings by section.

### A. Introductory Finding

*Finding 1.2.* Ms. Shelby assigns error to the statement in finding 1.2 that "[t]he Respondent's treatment of Patient A did not meet the denturist standard of care." CP at 391. This overarching finding in the introduction is supported by the health law judge's more specific findings as to the relevant standard of care and as to Ms. Shelby's acts and omissions. The specific findings were addressed in the next several sections of the health law judge's findings, which we examine below.

### B. "Denturist Standard of Care" Findings

To determine whether Ms. Shelby's treatment complied with the standard of care of a denturist treating patients in Washington, the health law judge first had to determine the applicable standard of care, which he did in his findings 1.5 through 1.13.

*Findings 1.5, 1.6, and 1.13.* In challenging findings 1.5, 1.6, and 1.13, Ms. Shelby argues that if taken literally, each is "an insignificant general statement." Br. of Appellant at 38-40. They can be taken literally. None of these findings purports to address whether Ms. Shelby *met* the standard of care. Ms. Shelby does not argue that findings 1.5, 1.6, or 1.13 incorrectly state the standard of care of a Washington denturist.

*Finding 1.11.* Ms. Shelby challenges finding 1.11's statement that "[o]ffering a patient the option of relining a problem temporary denture into a permanent denture when the problems associated with the denture cannot be remedied[ ] does not meet the

8

denturist standard of care." CP at 392. She argues that "[n]o expert testified that this

violated the standard of care." Br. of Appellant at 39.

Ms. Shelby is mistaken; the testimony of two experts supported this important

finding. Mr. Cherron testified:

Q.   And in November, did she give the patient two options?
A.   Again, gave her two options. To either reline this denture or make a
     new one.
Q.   Okay. And that would be the hard reline?
A.   The laboratory-formed hard reline that would not have the ability to
     have bacteria sneak underneath the two materials.
Q.   Or a new denture?
A.   Or a new denture.
Q.   Okay. Do you believe that both options would be appropriate in this
     case?
A.   No.
Q.   And why is that?
A.   A reline of this denture would not correct the problems that it has at
     this point. A reline would not appropriately bind the teeth to the
     new denture base. A reline only replaces the tissue side of the
     material or where the temporary material had been placed. It does
     not have anything—a reline does not have anything to do with where
     the teeth are formed, the acrylic itself. That procedure is called a
     rebase.
Q.   Would often a reline at that point be in violation of the standard of
     care?
A.   I believe it falls below the standard of care.
Q.   And what was the appropriate option at that point?
A.   To only make a new denture.

CP at 683-84.

Mr. Vize testified:

Q.   I believe you testified that the reline of this denture in December
     would have been unthinkable?

9

A. I'm shocked that that was even offered to the patient given the severe problems with this denture. The fact that she would—I mean, you know, even if she was doing it for free, it wouldn't solve the problem. But the fact that she's willing to take another two hundred and fifty dollars from this patient, it wouldn't have solved any problem. Again, it's like I said, the analogy that I used about putting tires on a car going to a junk yard. I mean, why bother. I mean it's unusable. A reline, it would make it fit better, but that's not going to solve the bite problem. It's not going to solve the appearance issues. It's not going to solve the occlusion issues. It's not going to solve the porosity issues. It's not going to solve the teeth popping out. So, I mean, I don't know what good that really would have done her. I'm really surprised that that was even suggested.

CP at 753.

The testimony of the two experts is substantial evidence supporting finding 1.11.

### C. Findings Specific To "Patient A"

*Findings 1.15 and 1.16.* The disciplinary proceeding was based on Ms. Shelby's treatment of the single complaining patient, referred to in the findings and conclusions as "Patient A." Ms. Shelby challenges the statement in finding 1.15 that "[a]fter Patient A's swelling subsided, Patient A continued to suffer pain and discomfort." CP at 394. She challenges the statement in finding 1.16 that "[t]he pain and discomfort associated with the misalignment made it difficult to wear the denture for short periods of time, and made it difficult to eat." *Id.* She argues that the patient "had no pain and discomfort after the initial swelling had subsided, until after the temporary denture wore out in November, 2007" and "there is no evidence that after the initial normal period of adjustment, Patient A had any difficulty wearing the denture for short periods of time or [that the denture]

10

made it difficult to eat, until after the denture had worn out approximately on October 30, 2007." Br. of Appellant at 40-41.

Two witnesses testified to the patient's pain and discomfort: the patient herself, and Mr. Vize, based on statements the patient made to him. Mr. Vize's testimony about the patient's statements during treatment was admissible. The rules of evidence serve as guidelines in administrative hearings but the APA gives presiding officers latitude to admit evidence not admissible under those rules if, in the judgment of the presiding officer "it is the kind of evidence on which reasonably prudent persons are accustomed to rely in the conduct of their affairs."[2] Even the evidence rules recognize statements that are made for the purpose of medical diagnosis or treatment as an exception to the hearsay rule. ER 803(a)(4).

Mr. Vize testified:

A.     She was having difficulties with a denture that had been made by another practitioner and she was unable to use it and she was seeking relief.

---

[2] RCW 34.05.452 provides, in relevant part:
(1) Evidence, including hearsay evidence, is admissible if in the judgment of the presiding officer it is the kind of evidence on which reasonably prudent persons are accustomed to rely in the conduct of their affairs. The presiding officer shall exclude evidence that is excludable on constitutional or statutory grounds or on the basis of evidentiary privilege recognized in the courts of this state. The presiding officer may exclude evidence that is irrelevant, immaterial, or unduly repetitious.
    (2) If not inconsistent with subsection (1) of this section, the presiding officer shall refer to the Washington Rules of Evidence as guidelines for evidentiary rulings.

11

Q.     And what were her complaints made to you?
A.     The general essence of it was—is that she had a denture that was unusable and she was unable to function with it. And you could refer back, or if you'd prefer that I do, back to this letter in the notes. She just basically stated that the denture was unusable, was the essence of it.
Q.     And do you recall what made it unusable for her?
A.     As far as what the patient stated or what ...
Q.     Yes.
A.     The patient stated that she was having problems with poor fit, repeated breakage. She stated that she found it very difficult to eat and function with the appliance. She said speaking was very difficult relating to the poor fit. And far and by large, she just didn't wear it.

CP at 733-34 (alteration in original).

The patient testified:

And—but I still continued to have problems with fit and the—the soreness in my mouth. And I kept having sore spots and she would go in and try to fix the denture. And at first I used like Poligrip and stuff like that, and then eventually she told me that to get some of that Denturite, and put on—on the denture to help cushion and help the fit. And I did that, and she also, the first time before she—I did it, she put the Denturite in the denture at first. And after maybe about two, three months that we've been continually having problems with the fit of the denture. And with the rubbing on my gums and—and stuff.

CP at 601.

Elsewhere, she testified:

Q.     Okay. During this—during this time that you had the denture for approximately 12 months, how did it affect your ability to—to eat food?
A.     Very poorly. I was unable to eat solid foods. I was—had to eat very soft foods and when I could have my denture in, and there was a lot of times that I couldn't even have my dentures in my mouth.
Q.     And why was that?

12

A.    Because of it hurting.
Q.    So would you take it out at night or during the day?
A.    I took it out at night, yes.
Q.    Would you have it out during the day?
A.    Pardon?
Q.    Would you have it out during the day?
A.    Sometimes.
Q.    Okay. And what kind of—describe any feelings you have while trying to chew food.
A.    Pardon?
Q.    Describe what it was like to chew food.
A.    Difficult. Very difficult. They would hurt or they would move. Or they just—just didn't work—
Q.    Okay.
A.    —properly.
Q.    Did it alter your diet?
A.    Yes.
Q.    And what kind of diet did you have [to] go on?
A.    Well, I—like I said, I was eating soft foods, I couldn't eat meat of any kind. I'd even have trouble eating hamburger.
Q.    Okay.
A.    And I was basically eating oatmeal and scrambled eggs and things like that that you didn't have to chew.

CP at 607-09.

Ms. Shelby focuses on the patient's statements made to her during the course of treatment, which the health law judge found were inconsistent, with the patient telling Ms. Shelby at times that she was satisfied with her treatment. *See* finding 1.26. Nonetheless, the testimony of other competent witnesses supports the health law judge's finding that the patient suffered pain and discomfort even after the initial swelling had subsided, making it difficult for her to wear the denture and difficult to eat.

13

Ms. Shelby also challenges the statement in finding 1.16 that "[t]he denture, as constructed, did not properly align with Patient A's teeth." CP at 394. She concedes that Mr. Vize testified that the denture, as constructed, did not comply with the standard of care, but she discounts his testimony as "invalid." Br. of Appellant at 40. This is evidently because Mr. Vize did not review her testimony or Ms. Shelby's treatment records but relied instead on what the patient told him about her care. While Mr. Vize was certainly subject to cross-examination, the fact that he relied upon what the patient told him does not make his testimony invalid.

She also argues that Mr. Vize's opinion alone could not meet the clear and convincing standard because "[a]n expert with superior education and training (Dr. Shannon), as well as two other denturists (Cherron and Shelby), contradicted this finding of fact." *Id.* at 41. It was for the health law judge to determine whose testimony was credible and persuasive, and he had no obligation to consider how many witnesses held a given opinion.

Mr. Vize testified that malocclusion was present when he saw the patient and would have been present from the time the denture was installed. He testified that while the degree of malocclusion was "not the worst that I've seen by any means," he "would term it severe." CP at 736. In later summarizing respects in which he believed the denture fell below the standard of care, he included his opinions that "the occlusion is incorrect" and "[t]he bite relationship is incorrect." CP at 748. Substantial evidence

14

supports the finding that the denture as constructed did not properly align with the patient's teeth.

*Finding 1.17.* Ms. Shelby challenges the finding that "[t]he over-the-counter products did not alleviate the pain and discomfort associated with the improperly constructed denture." CP at 394. Ms. Shelby argues that the evidence showed that the patient did not follow Ms. Shelby's instruction to use Denturite.

It was Ms. Shelby's position that the patient did not follow her instructions about using Denturite, but the patient never testified to that effect; the patient testified "I did everything that she would tell me to do," and elsewhere, "[E]ventually she told me that to get some of that Denturite, and put on—on the denture to help cushion and help the fit. And I did that." CP at 601. Regardless of whether the patient followed Ms. Shelby's directions or not, the evidence established that the patient's use of over-the-counter products did not alleviate her pain and discomfort, as demonstrated in addressing findings 1.15 and 1.16, above. And while not directly related to this finding or Ms. Shelby's challenge to it, both Mr. Cherron and Mr. Vize criticized Ms. Shelby's recommendation that the patient use Denturite after Ms. Shelby installed a Lynal liner on the denture, because of the risk of bacterial accumulation and infection. *See* CP at 671-72, 821. Substantial evidence supports the finding.

15

*Finding 1.18.* Ms. Shelby challenges the finding that "[t]he cause of the teeth falling out was the improper construction of the denture from the outset due to an improper bond between the denture acrylic and the denture teeth." CP at 394.

Mr. Cherron testified that "[i]t's uncommon for teeth to pop out when they're manufactured properly" and, when asked about whether the patient's teeth were manufactured properly, testified that it was "very predictable" that the three teeth that the patient was required to have repaired would pop off the denture base. CP at 676-77. Explaining to the health law judge while handling one of the teeth, he testified that "[t]his tooth has not been prepared to the point where it was going to properly bind" and pointed out a couple of problems with its preparation. CP at 677. Later, he testified:

> I've delivered ten thousand dentures in my over ten years of experience.
> I've delivered fifteen hundred to two thousand immediate dentures just like
> this. Of all those cases, I could quote you two or three that the teeth pop
> out. And it's a mistake I've made. And when that happens, I remake the
> denture or at a minimum I replace all of the pink part with a product called
> a rebase. And what that does is it stabilizes the whole denture base. Refit it
> to the patient's mouth, so it doesn't have discomfort or rocking and it
> reinserts the teeth into the denture base, so they don't pop out any longer.

CP at 706.

When Mr. Vize was asked his opinion why the patient's teeth were popping out, he testified:

> A.    There can be a variety of causes. Technically speaking, the most
>       common cause of an acrylic tooth popping out—I want to make
>       clear the designation—these are acrylic teeth in this denture. Acrylic
>       teeth should be very, very solidly bonded to the denture base. The

16

teeth are made of a material called polymethylmethacrylate, PMMA, for short. The pink denture base is made from a material called PMMA, polymethylmethacrylate. A molymer (phonetic) is used. It's a solvent. And what happens when a denture is processed is the solvent, the molymer, chemically bonds the tooth to the base. An analogy would be pipe dope on a PCV pipe. And when a practitioner processes a denture, the most common cause—to answer your question, the most common cause of the tooth popping out is the separator film. It's not cleaned off of the underneath side of the tooth by scrubbing it. That can happen. An oversight can happen. There are other things that are clearly present with the denture. The other most common cause is improper curing of the denture, trying to cure the denture too fast.

Q. And what do you mean by curing?

A. Dentures—when the denture base material, the pink stuff that you see on the denture, when I refer to it as the base, that's what I'm referring to, the pink stuff, that has to go through a process of curing. Most commonly a hot-water bath. And the most common procedure is to cure it at a lower temperature of 163 degrees for nine hours and boiling for the last thirty minutes. So, a total of nine and a half hours. But when you cure a denture too quickly, if you're in a rush, sometimes it's dropped directly into boiling water and it flash cures the material, which leads to a poor bond between the tooth and the base. And porosity in the denture base itself, which this also displays.

CP at 740-41. He testified that the denture manufactured for the patient by Ms. Shelby was "not the worst that I've seen, but I would say it's significantly porous," later testifying that "[a] porours denture base like this shouldn't be allowed to leave the office" and that it "[a]bsolutely" could be a cause of teeth popping out. CP at 743.

*Finding 1.20.* Ms. Shelby challenges the finding that "[t]he denture was fractured due to the porous nature of the denture acrylic. This was caused by improper construction of the denture from the outset." CP at 395. She argues only that "[t]he

17

reasons why this finding of fact is erroneous were discussed previously in this brief." Br. of Appellant at 42.

A word search reveals that Finding 1.20 is not discussed elsewhere in the brief. We will not consider assignments of error that are unsupported by legal argument and relevant authority. RAP 10.3(a)(6); *Howell v. Spokane & Inland Empire Blood Bank*, 117 Wn.2d 619, 624, 818 P.2d 1056 (1991). We also note, however, that Mr. Vize testified that the denture was "significantly porous" and that although fractures are common, the porosity of this denture in particular would weaken it, meaning that less force would be needed in order for it to break. CP at 743.

*Finding 1.21.* Ms. Shelby challenges the finding that "[i]t was a violation of the denturist standard of care to instruct Patient A to continue to use a temporary denture when the denture was a poor fit, it fractured and lost teeth, and the pain and discomfort associated with the denture could not be alleviated by the denturist or by the Patient using over-the-counter products." CP at 395. She argues that there was no evidence she instructed the patient to wear the denture after October 30 and no testimony that the standard of care required her to stop wearing the denture before October 30.

The patient acknowledged that at an October 30 appointment, Ms. Shelby told her that the temporary denture needed to be relined or replaced. But there was ample evidence that the problems predated October 30 and that Ms. Shelby continued to perform repairs with a view to the patient's continuing to use the temporary denture,

contrary to the denturist standard of care. See the discussion of findings 1.11, 1.15, and 1.16.

*Finding 1.22.* Ms. Shelby challenges the finding that "[t]he problems with the denture as constructed could not be remedied by repairing the denture. The Respondent should not have offered to reline the denture since the reline would not have corrected the problems with improper construction. Under the denturist standard of care, the Respondent should have constructed a new denture for Patient A at no cost to the patient. This should have occurred without regard to the life of the original temporary denture." CP at 395.

She argues that "[t]he reason why the first sentence is erroneous has been discussed previously in this brief." Br. of Appellant at 42. She provides no further explanation or direction. Here again, we will not consider assignments of error that are unsupported by legal argument and relevant authority. We note, however, that the evidence previously discussed in connection with findings 1.11, 1.15, and 1.16 supports the first sentence of the finding.

Ms. Shelby argues that the remainder of the finding is erroneous "because no expert testified that [Ms.] Shelby was required to give Patient A a new denture for free." *Id.* But finding 1.7, which Ms. Shelby did not challenge and which is therefore a verity on appeal,[3] states, "If a denture is improperly constructed from the outset, it is the

---

[3] Unchallenged factual findings are verities on appeal. *Tapper v. Emp't Sec. Dep't*, 122 Wn.2d 397, 407, 858 P.2d 494 (1993).

obligation of the treating denturist to remedy the situation (including construction of a new denture if necessary) at no cost to the patient regardless of the period of time that has passed since the denture was first seated." CP at 391-92. The remainder of finding 1.22 is supported by finding 1.7.

*Finding 1.23.* Ms. Shelby challenges the finding that "[t]he Respondent's failure to meet the denturist standard of care in her treatment of Patient A caused patient harm by causing pain and discomfort to Patient A over an extended period of time" and that "[t]he harm to Patient A was moderate in nature." CP at 395.

Yet again, she argues that the reasons why the first sentence is erroneous are addressed previously in her brief—argument that is, again, insufficient under our rules. We have previously addressed the sufficient evidentiary support for the health law judge's findings that the patient experienced pain and discomfort from the ill-fitting denture and that the denture constructed did not meet the denturist standard of care.

As to the remainder of the finding, she argues "there was no evidence to support the assertion that the degree of 'harm' to Patient A was 'moderate'"; that "moderate" is a technical word that means medium in degree, and "[t]here is no evidence that Patient A had *any* diagnosed problem caused by this denture, much less any problem that reached the level of moderate." Br. of Appellant at 43 (emphasis added).

"Moderate" is a term used to describe a tier of harm considered in imposing sanctions under the sanction schedule for "practice below the standard of care" found at

WAC 246-16-810. "Moderate" is not defined by agency regulations and Ms. Shelby provides no authority in offering her definition. But the State does not dispute that "medium in degree" is a commonly understood meaning of "moderate."

Sufficient evidence supports a finding that Ms. Shelby's practice caused moderate harm to the patient. The health law judge could reasonably find that continued pain, difficulty eating and speaking, and being forced to change a patient's diet to soft foods, qualify as moderate harm. Additionally, there was evidence that the patient was subjected to a moderate or severe *risk* of harm because the extended use of Lynal as a soft liner (coupled with application of Denturite) created a condition under which bacteria could build up and put the patient at a risk of infection. *See* finding 1.25. The health law judge did not err in finding that the patient suffered moderate harm.

*Findings 1.24 and 1.25.* Ms. Shelby challenges findings 1.24 and 1.25, which reiterate her violation of the standard of care, for "reasons . . . previously discussed in this brief." Br. of Appellant at 43-44. The insufficiency of this type of argument has been previously discussed in this opinion.

*Finding 1.26.* Ms. Shelby challenges the health law judge's finding 1.26 that, while the patient's communications to Ms. Shelby were inconsistent, "under the denturist standard of care, the Respondent should have been able to detect the problems with the denture while treating Patient A without relying solely on the patient's inconsistent communications." CP at 396. She contends that there is no evidence to support implied

21

assertions that she (1) failed to detect the problems with the denture and (2) relied solely on the patient's inconsistent communications.

Mr. Vize testified that problems with the denture included malocclusion, the denture base was incorrect in that it is severely or significantly porous, the denture did not fit correctly, the denture was not aesthetically pleasing, and the denture was "simply unusable." CP at 748. Mr. Cherron testified that problems with the denture included obvious fractures that would continue due to a failure to put a hard liner in the denture and teeth that had popped out and would continue to pop out because of an error in its manufacture.

The health law judge's finding that Ms. Shelby failed to detect the problems is supported by the expert evidence that identified those problems coupled with Ms. Shelby's continuing denial that any problem existed. We defer to the health law judge's weighing of the evidence and credibility determinations. He found that the problems did exist, but that Ms. Shelby failed to recognize them.

The finding that Ms. Shelby relied solely on the patient's communications is supported by Ms. Shelby's testimony; her defense to the charges was, and continues to be, that if the patient had complaints, she never communicated them to Ms. Shelby. *See, e.g.*, CP at 807 (agreeing that she had a "friendly amicable pleasant relationship" with the patient and "never knew" that the patient was not satisfied). The finding that the patient's reports to Ms. Shelby were inconsistent was supported by the testimony of the patient and

Mr. Vize to the effect that the patient had reported some problems to Ms. Shelby. Here again, what the patient told Mr. Vize about her prior treatment by Ms. Shelby was admissible.

### D. Challenged Conclusions of Law

Ms. Shelby challenges the health law judge's conclusions of law on the grounds that the State did not prove its charges by clear and convincing evidence, renewing her argument that Dr. Shannon was a "superior expert" and arguing that the fact that Mr. Cherron and Mr. Vize were not in complete agreement in their opinions weakened the State's case. She again argues that there was no proof of harm beyond "minimal" harm. Her assignments of error to the conclusions of law also refer to "reasons . . . discussed previously in this brief," which, in light of RAP 10.3(a)(6), we will not attempt to divine.

We have already determined that the 16 findings of fact to which Ms. Shelby assigns error are supported by substantial evidence, bearing in mind the clear and convincing standard applied by the health law judge.

As to the conflicting opinions by experts, we have already discussed the fact that credibility determinations are for the health law judge to make, not us. *See Smith v. Emp't Sec. Dep't*, 155 Wn. App. 24, 35, 226 P.3d 263 (2010).

Finally, we have already determined that the finding of "moderate" harm is supported by substantial evidence.

23

The health law judge found that Ms. Shelby did not adequately bind the teeth to the denture, causing them repeatedly to break off (finding 1.18). He found that the denture was poorly constructed causing malocclusion (findings 1.13, 1.16). He found that Ms. Shelby failed to adequately address the porous nature of the denture (finding 1.20). His findings support the charge that Ms. Shelby left the liners in the patient's mouth for too long, making them susceptible to bacterial accumulation and the risk of infection (finding 1.25). He found that the only solution to the repeated problems consistent with the denturist standard of care was for Ms. Shelby to construct a new denture for the patient at no cost, which Ms. Shelby failed to do (finding 1.22). The health law judge's findings support his conclusion that Ms. Shelby committed unprofessional conduct.

### III. *Challenge to Sanctions*

Finally, Ms. Shelby challenges the sanctions imposed by the health law judge.

The Uniform Disciplinary Act (Act), chapter 18.130 RCW, governs the licensing and discipline of health care professionals, including denturists. RCW 18.30.135. It provides that "[i]ncompetence, negligence, or malpractice which results in injury to a patient or which creates an unreasonable risk that a patient may be harmed" constitutes unprofessional conduct by any license holder covered by the chapter. RCW 18.130.180(4); *Brown*, 94 Wn. App. at 13. The Act provides for the development by the secretary of health of a uniform schedule of sanctions and provides that disciplining

24

authorities "shall" impose sanctions as directed by that schedule anytime they find that a

license holder has committed unprofessional conduct. RCW 18.130.160, .390.[4]

The sanctions schedule adopted by the secretary that is to be applied where a

license holder has been found to have practiced below the standard of care is set forth in

WAC 246-16-810, which we reproduce below:

---

[4] As provided by RCW 18.130.390(2), the uniform sanctioning schedule was to be applied to all disciplinary actions commenced under the Act after January 1, 2009. The secretary was directed to use emergency rule-making authority to adopt rules taking effect by that date; emergency rules were adopted by Emergency Rule-Making Order WSR 09-01-188 (effective Jan. 1, 2009) and WSR 09-09-035 (effective May 1, 2009). The statement of charges against Ms. Shelby was filed on January 23, 2009, making the uniform sanctioning schedule applicable.

| PRACTICE BELOW STANDARD OF CARE | | | | |
|---|---|---|---|---|
| Severity | Tier / Conduct | Sanction Range In consideration of Aggravating & Mitigating Circumstances | | Duration |
| | | Minimum | Maximum | |
| least  ↓  greatest | A – Caused no or minimal patient harm or a risk of minimal patient harm | Conditions that may include reprimand, training, monitoring, supervision, probation, evaluation, etc. | Oversight for 3 years which may include reprimand, training, monitoring, supervision, evaluation, probation, suspension, etc. | 0-3 years |
| | B – Caused moderate patient harm or risk of moderate to severe patient harm | Oversight for 2 years which may include suspension, probation, practice restrictions, training, monitoring, supervision, probation, evaluation, etc. | Oversight for 5 years which may include suspension, probation, practice restrictions, training, monitoring, supervision, probation, evaluation, etc. OR revocation. | 2 years - 5 years unless revocation |
| | C – Caused severe harm or death to a human patient | Oversight for 3 years which may include suspension, probation, practice restrictions, training, monitoring, supervision, probation, evaluation, etc. In addition - demonstration of knowledge or competency. | Permanent conditions, restrictions or revocation. | 3 years - permanent |

Once the appropriate sanctions schedule has been identified, the disciplinary authority charging a licensee with unprofessional conduct under the Act "identifies the severity of the unprofessional conduct and identifies a tier using the sanction schedule tier descriptions." WAC 246-16-800(3)(b). It then "identifies aggravating or mitigating factors," using a list provided by WAC 246-16-890. WAC 246-16-800(3)(c). It finally

"selects sanctions within the identified tier," with "[t]he starting point for duration of the sanctions [being] the middle of the tier range." WAC 246-16-800(3)(d).

Here, the health law judge found that Ms. Shelby's practice below the standard of care caused moderate harm or risk of moderate to severe harm, falling in Tier B. The midpoint for the duration of the sanctions imposed under Tier B is 3.5 years. The health law judge found two aggravating factors: that Ms. Shelby committed multiple violations of the denturist standard of care and that her unprofessional conduct occurred over an extended period of time.[5] It found one mitigating factor: the lack of intention to harm the patient. Based on the aggravating and mitigating factors, the health law judge concluded that "the conduct falls in the lower end of Tier B of the sanction schedule" and ordered that Ms. Shelby's denturist license be suspended for at least two years, allowing her to seek reinstatement two years from the date of his final order. CP at 397. He also imposed a $5,000 fine and ordered her to refund all fees that she charged the patient for treatment.

---

[5] The department points out that WAC 246-16-890 provides for several more aggravating factors that the health law judge could have applied: being an experienced denturist (WAC 246-16-890(2)(a)), offering no refund to the patient (WAC 246-16-890(3)(c)), not showing remorse for her conduct (WAC 246-16-890(3)(f)), and having been subject to prior discipline by the department (WAC 246-16-890(2)(b)). While we may affirm an agency decision on grounds not cited by the agency, *see Heidgerken v. Dep't of Natural Res.*, 99 Wn. App. 380, 388, 993 P.2d 934 (2000), we choose not to reach other grounds where the findings made by the health law judge are sufficient.

We accord considerable deference to an agency's determination of sanctions, as the appropriate sanction is peculiarly a matter of administrative competence. *Brown*, 94 Wn. App. at 16 (citing *State ex rel. Wash. Fed'n of State Emps. v. Bd. of Trustees of Cent. Wash. Univ.*, 93 Wn.2d 60, 68-69, 605 P.2d 1252 (1980)). Following the 2008 adoption of RCW 18.130.390, which directed the secretary of the department of health to develop schedules defining appropriate and consistent ranges of sanctions, a sanction that is imposed in accordance with the department's regulations and is based on findings of aggravating and mitigating circumstances supported by the record is well-nigh invulnerable to attack.

The health law judge in this case substantially followed the procedure for determining statutes required by the regulations; if anything, he was more lenient. The aggravating factors he found are supported by the evidence.[6] Ms. Shelby has not demonstrated any abuse of discretion.

---

[6] Both Mr. Vize and Mr. Cherron testified to multiple violations of the denturist standard of care. And given what the health law judge found to be unprofessional conduct, the conduct began with the improper manufacture of the denture in or about March 2007 and continued until at least December 4, 2007, the last time Ms. Shelby saw Patient A. The misconduct may have continued to February 4, 2008 when Ms. Shelby refused to give Patient A a refund.

No. 31494-4-III
*Shelby v. Wash. State Dep't of Health*

Affirmed.

A majority of the panel has determined that this opinion will not be printed in the

Washington Appellate Reports but it will be filed for public record pursuant to RCW

2.06.040.

_____
Siddoway, C.J.

WE CONCUR:

_____
Korsmo, J.

_____
Knodell, J.P.T.

29